SARAH E. LEE, Administratrix of the Estate of Thomas Lee, Deceased, v. MARION SAVINGS BANK and JAY J. SMYTH, Appellants.

**Fraud: EVIDENCE.** A debtor engaged in shipping poultry, to prevent his creditor from seizing the shipments, had them made in the name of a president of a bank with which he did business. Afterwards the debtor gave his note, secured by a mortgage on all his property, to the bank, to obtain an alleged credit at the bank; and a certificate of deposit, payable on presentation, was properly indorsed and delivered to a third person, to whom the debtor was not indebted, and left in his hands for six months.

No reason therefor appeared, other than it was to hinder and defraud said creditors. Afterwards the certificate was pledged as collateral. The president was throughly acquainted with the debtor's circumstances and business, and knew of the debt, and of the debtor's desire to avoid paying it.   *Held*, that the note and mortgage are fraudulent as against said creditor.

KNOWLEDGE OF BANK PRESIDENT. That the president of a bank knows of the desire of a shipper of goods to prevent the shipment from being seized on a certain claim against him, does not deprive the former of the right, in good faith, to secure the bank for advances made to the shipper by having the shipments changed to his own name.

SAME.   A bank is bound by the acts of its president in respect to a transaction between him and a third person and by his knowledge of the latter's purpose to defraud his creditors in such transaction.

EVIDENCE: *Declarations*,  Declaration of a president of a bank made when he was not transacting the business of the bank are not admissible against it.

Estoppel: EXECUTOR AND ADMINISTRATRIX.  Knowledge by a mother of the fraudulent intention of her son in executing a mortgage will not estop her to maintain an action as administratrix of the son to set aside the mortgage as fraudulent as she stands as the representative of the estate and its creditors, and such is the case even though she is one of the principal creditors.

EVIDENCE.  In an action by an administratrix to cancel an alleged fraudulent mortgage executed by the intestate, evidence of what he told her, before his death, concerning the mortgage, is inadmissible to show that she had knowledge of its invalidity before her appointment. and of the subsequent sale of the mortgaged property, since the intestate, if living, could not testify to making such statements.

*Appeal from Linn District Court.*—HON. G. W. BURNHAM,
Judge.

WEDNESDAY, APRIL 5, 1899.

ACTION in equity to cancel a certain mortgage on real estate, and the promissory note secured thereby, executed by deceased to the defendant bank, and for an accounting by the defendants for all money received by them on behalf of the deceased, and for judgment for the amount found due.

Issues were joined, as will hereafter appear, and, on a hearing had, decree was rendered in favor of the plaintiff as prayed, and judgment against "the defendants" for one thousand two hundred dollars, with interest at six per cent. per annum on one thousand dollars from June 1, 1893, and on two hundred dollars from July 1, 1893, and for costs. The defendants separately appeal. *Reversed* as to Defendant Smyth.

*Jamison & Smyth* for appellants.

*M. P. Smith & Son* and *D. E. Voris* for appellee.

GIVEN, J.—I. Thomas Lee, an unmarried man, resided for a number of years with his mother, Sarah F. Lee, in Marion, Iowa, prior to his death, which occurred on February 27, 1893. For some ten years prior to his death, Thomas Lee was extensively engaged in buying, dressing, and shipping poultry to the New York and Chicago markets, and continued in that business up to the time of his death. Mr. Lee's means were limited; he having no property other than the house and lot covered by the mortgage in question, where he and his mother resided, and the buildings and sheds on leased grounds, in which he carried on his business, together with the portable coops and other appliances used in handling poultry. It does not appear that deceased had any considerable sum of money, except that embraced in his account with the First National Bank, and that involved in this controversy. His business for the two years preceding his death was quite extensive, and was largely, if not entirely, carried on with borrowed money. During these years the defendant bank and the First National Bank, though separate corporations, were doing business in the same place in Marion; the officers of the First National Bank being stockholders and officers of the defendant bank, and the defendant Smyth being president of both banks for most of the time under consideration. Thomas Lee trans-

acted his banking business through the First National Bank, checking on that bank to pay for poultry purchased, and expenses of the business, and drawing drafts in its favor against shipments made. From the latter part of the winter of 1891 the bills of lading were either assigned to Jay J. Smyth, or the shipments made in his name, for the use of the First National Bank, and the proceeds credited to Thomas Lee on his account. On the third day of May, 1892, Thomas Lee executed to the defendant bank his mortgage on said house and lot to secure his promissory note of that date to the defendant bank for two thousand dollars, payable six months after date, with interest at seven per cent. per annum. On the same day he executed a chattel mortgage to the defendant bank, to secure payment of the same note, on said buildings, sheds, poultry boxes, and shipping coops on said leased premises. No money was paid to Mr. Lee, but the amount (two thousand dollars) was placed to his credit by the First National Bank. On the same day Mr. Lee drew his check on the First National Bank for two thousand dollars, and received therefor a certificate of deposit for that amount, payable to William G. Thompson "on return of this certificate properly indorsed. * * * This deposit not subject to check." This certificate was delivered to William G. Thompson, but whether Jay J. Smyth was present, or had knowledge of the fact, is in dispute; also, the purpose for which it was delivered. Mr. Thompson retained the certificate until January 16, 1893, when, at the instance of Mr. Lee, and in his presence, he delivered it, indorsed, to Jay J. Smyth. On that day Thomas Lee executed another promissory note to the defendant bank for three thousand five hundred dollars, due ten days after date, with eight per cent. interest; and this certificate of deposit was attached thereto, to be held as collateral security. Soon after the death of her son, the plaintiff, Sarah F. Lee, was appointed to administer upon his estate, on her own application, wherein she made oath "that the deceased left personal property, as

she is informed, amounting only in value to the sum of less than two hundred dollars." On the fourth day of March, 1893, she filed an inventory showing the personal property to consist of the slaughtering house and fixtures, "subject to a mortgage of $2,000 given to one Jay J. Smyth, of Marion, Iowa." Claims aggregating about seven thousand dollars, including one for six thousand dollars to plaintiff, Sarah F. Lee, for money borrowed in July, 1890, were presented and allowed. On the thirtieth day of June, 1893, plaintiff filed her petition in probate, asking an order to sell the chattel property covered by said mortgage, to apply on the note secured thereby. An order was made, and after an appraisement the property was sold to one Wheeler for one thousand two hundred dollars, one thousand dollars of which was paid to the defendant bank June 30th, and the remaining two hundred dollars July 1, 1893, and credited on said two thousand dollars note. There is a controversy as to whether this application for appointment, inventory, and petition was framed at the dictation of Mr. Smyth.

II. We first consider the case as presented on the appeal of defendant Jay J. Smyth. The only claim made against him in the petition was in the eleventh paragraph thereof, and as to this the plaintiff dismissed. Therefore there was no action pending against Mr. Smyth. But through inadvertence the judgment was rendered against "the defendants," instead of the defendant bank. The judgment as to the defendant Smyth is reversed, and judgment will be entered dismissing as to him.

III. The contention being solely between the plaintiff and the defendant, the Marion Savings Bank, we are not called upon to make an accounting with Jay J. Smyth or the First National Bank, and therefore much of the evidence taken is not applicable. Plaintiff's contentions are that the notes and mortgages executed by the deceased to the Marion Savings Bank were executed and received to hinder, delay, and defraud the creditors of Thomas Lee, and especially F.

C. Linde & Co., and that said two thousand dollar note is without consideration. Wherefore it is claimed that said mortgages and the two thousand dollar note are fraudulent and void, and that plaintiff is entitled to recover the amount realized from the sale of said chattel property. These claims the defendant bank denies, and herein we have the issues to be considered. The defendant bank presents a number of objctions to testimony offered by plaintiff, as immaterial, which objections are in the main well taken. We will not extend this opinion by considering these objections in detail, but proceed to dispose of the case upon the competent and material evidence, as we find it to be.

IV. It appears that Thomas Lee executed his promissory note for one thousand dollars to Harry Dowie, of New York City, due April 5, 1891, on account of business transactions between them, which note Dowie transferred to F. C. Linde & Co., of the same city. This claim Mr. Lee evidently regarded as unjust, and was averse to paying the same. In the winter of 1891-92 he made a shipment to Dowie, and drew against it; but Dowie allowed the draft to go to protest, as Lee and Smyth supposed, for the purpose of allowing Linde & Co. to seize the shipment. Thereupon Smyth, with the consent of Lee, ordered the shipment to be delivered to A. G. Reed, to whom all future New York shipments were made, and in the name of Smyth. We are in no doubt that Mr. Smyth knew of Mr. Lee's desire to prevent his shipments from being seized on the Linde & Co. claim; but that did not deprive him of the right in good faith of securing his bank (the First National) for advances to Lee, by having the shipments in his name. Lee's house and lot and his packing establishment were open to be pursued by Linde & Co. until covered by the mortgages of May 3, 1892, given to secure Lee's note for two thousand dollars to the defendant bank. Lee, though a borrower in need of money in his business, got no money on that transaction, but was credited with the amount on his

account with the First National Bank, and allowed to check against it. If Lee had checked against this credit in the usual course of his business, there would be no reason for holding the transaction fraudulent or without consideration, but he did not do so. On the same day he gave his check for the full amount of the credit, receiving therefor a certificate of deposit, payable, on presentation, properly indorsed, to William G. Thompson, to whom he was not indebted. It is said that this certificate was given to Maj. Thompson to settle the Linde & Co. claim; but Maj. Thompson does not say so, nor is there evidence to support the assertion. The Linde & Co. claim was in the hands of other attorneys for collection, and Maj. Thompson had nothing whatever to do with it. No reason was given to Maj. Thompson why the certificate was left with him, and no reason appears, other than that it was to hinder, delay, and defraud Linde & Co. in the collection of their claim. It will be observed that by this transaction all the visible property of Thomas Lee was covered, as against Linde & Co. By it, Thomas Lee though in debt and in need of money, leaves this two thousand dollars, upon which he was paying interest, idle in the hands of Maj. Thompson from May till January. In January the certificate is taken from its hiding place, where Linde & Co. could have pursued it, had they known the facts, and again covered, by being pledged as collateral to the three thousand five hundred dollar note. It cannot be doubted that by these unusual transactions Thomas Lee sought to cover up his property so as to hinder, delay, and defraud Linde & Co. in the collection of their debt against him. It is clear that Maj. Thompson did not know of, or share in, this purpose, in receiving and holding the certificate of deposit; but we think it is evident that Mr. Smyth did. He alone acted for his banks in all these dealings with Lee. He was thoroughly acquainted with Lee's circumstances and business; knew of the Linde & Co.

claim from the time the draft was protested, and of Lee's desire to avoid paying it. He conducted the transactions by which the two thousand dollar note and mortgages were given, the credit passed, and the certificate of deposit issued. It is denied that he knew of the certificate being left with Thompson. Thompson says, "I delivered it to Mr. Smyth at the request of Mr. Lee, and as it was directed when it was left with me." If it was directed to be delivered to Smyth at the time it was left with Thompson, it would seem that Smyth knew of its being left with that direction, and that Thompson held it with the consent of both Lee and Smyth. As already stated, Mr. Smyth alone conducted these transactions on behalf of his banks; and there can be no question but that the banks are bound by his acts in respect thereto, and his knowledge of Lee's purposes. It does not appear whether Lee's estate ever received any consideration for the two thousand dollar note or not. If the certificate was applied on the three thousand five hundred dollar note, then it may be said it has; otherwise, it has not. Whether consideration has been received for the two thousand dollar note or not, we are of the opinion that it, and the mortgages given to secure it, were executed and received with the intention thereby hindering, delaying, and defrauding Linde & Co. in the collection of their claim. There is some evidence of declarations made by Mr. Smyth, but, as they were not made when he was transacting the business, they are not considered. See *Bank v. Kellog,* 81 Iowa, 126.

V. The appellant bank insists that plaintiff had full knowledge of any fraud or want of consideration there may be in these mortgages before she filed her application for appointment, her inventory, and her petition for the sale of the property, wherein she admits their validity; that for these reasons, and the fact that she allowed the proceeds of the sale to be applied on the two thousand dollars, she is now

estopped from questioning the validity of the mortgages, or claiming the proceeds of the sale. Testimony was taken, under defendant's objection, tending to show that deceased told his mother that the mortgages were only for protection, and that he had not received a dollar on them; also that Mr. Smyth had said, the next day after the funeral, that the mortgages were made "to protect Tom against an unjust claim." We think appellant's objections were well taken to all this testimony, and therefore have not considered it in arriving at the conclusion already announced. If the deceased was living, he could not testify to the conclusions as stated to his mother; and as the statements said to have been made by Mr. Smyth were not made "touching matters of business which he is transacting when they are made, and which are in the scope of his authority," they were not competent on behalf of the plaintiff. See *Bank v. Kellog, supra.* What Mr. Smyth did say was not as a representative of the bank, but by way of advice to the mother of his friend, the deceased. We do not think that it should be said from this record that this aged woman, inexperienced in such business, did understand the character of these mortgages at the time the proceedings in probate were had. Concede, however, that she did; still, as in this action she stands as the representative of the estate and its creditors, the doctrine of estoppel should not be applied. True, she is the largest creditor; but, if she were the only one, we think, under the facts, she should not be held to be estopped from asserting fraud and want of consideration in these mortgages. It follows from these conclusions that the estate is entitled to recover from the Marion Savings Bank the amount it received from the sale of the mortgaged chattels. The decree and judgment of the district court are reversed as to Jay J. Smyth, and affirmed as to the Marion Saings Bank.—MODIFIED AND AFFIRMED.